Mary R. Russell, Judge
The family of Shannon Dodson (“Plaintiffs”) brought a wrongful death action against defendant healthcare providers (“Defendants”) after Ms. Dodson tragically died as a result of a- dissection of her left main coronary artery during a cardiac catheterization. The jury returned a verdict in the amount of $1,831,155 for economic damages and $9 million for noneco-nomic damages. The trial court- reduced the noneconomic damages to $350,000 pursuant to section 538.210(1).[1] Both Plaintiffs and Defendants appeal. .
Plaintiffs argue that the section 538.210(1) cap on noneconomic damages *550 does not apply in wrongful death.cases in light of Watts v. Lester E. Cox Med. Ctr., 376 S.W.3d 633 (Mo. banc 2012), and, further, that imposing the cap only on wrongful death plaintiffs violates the equal protection, right to trial by jury or separation of powers provisions of the Missouri and United States Constitutions.
Plaintiffs also contend that- the trial court.erred in granting a directed verdict on the issue of aggravating circumstances damages at the close of Defendants’ evidence, while Defendants argue that the trial court erred in not granting the motion for directed verdict on aggravating circumstances damages earlier in the case, specifically at the end of Plaintiffs’ evidence.
Defendants’ other issues on appeal are that the trial court failed to grant their motion for new trial, which concerned the questioning of two defense witnesses, and their motion fór a directed verdict on the issue of economic damages, and that the court erroneously - gave jury instruction No; '4 advising the jury to not consider insurance benefits.
This Court holds that the section 538.210 noneconomic damages cap does not violate the right to trial by jury in wrongful death cases. This issue Was previously resolved in Sanders v. Ahmed, 364 S.W.3d 195 (Mo. banc 2012), which controls here. Sanders held that the wrongful death action was not recognized at common law in 1820 in Missouri but is, instead, a statutory creation subject to statutory caps and limitations. Watts does not impact the outcome of this case as Watts involved a claim for personal injury, which was a cause of action recognized at common law and was “not subject to legislative limits on damages” when the constitution was adopted in 1820. 376 S.W.3d at 638-39. As a result, Watts held that the statutory cap on damages violated the right to trial by jury as applied to medical malpractice actions alleging common law personal injury claims. Id. at 640.
Plaintiffs’ claim that section 538.210 violates the separation of powers was also rejected by this Court in Sanders, 364 S.W.3d at 204-205.
Further, the section 538.210 noneconomic damages cap does not violate equal protection as the distinction in the treatment of common law personal injury plaintiffs and wrongful death plaintiffs is a product of this Court’s interpretation of the right to trial by jury as driven by the constitutional provisions of this state. See Watts, 376 S.W.3d at 640, and Sanders, 364 S.W.3d at 202-204.
Plaintiffs also contend that the trial court erred in granting, a directed verdict on the issue of aggravating circumstances damages at the, close of Defendants’ evidence. To make a submissible case for aggravating circumstances damages against healthcare providers, Plaintiffs were required 'to show that the healthcare providers demonstrated “willful, wanton or malicious misconduct” in their actions causing the damages as alleged in the petition.' In light of'the actions of the healthcare providers here, the evidence does not clearly and convincingly demonstrate that the healthcare providers acted with complete indifference to or conscious disregard for the safety of Ms. Dodson.
This Court finds no error in Defendants’ other issues on appeal.
The judgment of the trial court is affirmed.
I. Factual Background
The facts of this case are devastating. Shannon Dodson, a 34-year-old wife and mother, sought treatment for shortness of breath at Mercy Hospital St. Louis on February 8, 2011. She was diagnosed with bronchitis. After a stress echocardio- *551 gram indicated that there might be some abnormalities with Ms. Dodson’s heart, a heart catheterization was recommended for further evaluation.
Dr. Robert Ferrara performed the heart catheterization on Ms. Dodson. During the procedure, Ms. Dodson suffered a left main coronary artery dissection, which cut off blood flow to the left anterior descending artery. Dr. Ferrara called for assistance, but no attempt was made to open the artery until approximately 30 minutes after the dissection occurred. Both doctors were unsuccessful in attempting to place a stent in the artery, and Ms. Dodson was transferred to the operating room for emergency surgery more than 45 minutes after Dr. Ferrara first noticed the dissection. The surgery was also unsuccessful, and Ms. Dodson died as a result of the dissection.
Ms. Dodson’s spouse, Jason Dodson, and their three children sued Dr. Ferrara and his employer, Mercy Clinic Heart and Vascular, LLC, alleging that Dr. Ferrara’s negligent care and treatment of Ms. Dodson caused or contributed to cause her death. They also sought aggravating circumstances damages.
The case was tried to a jury. At the close of all the evidence, the trial court gave a directed verdict in favor of Defendants on the claim for aggravating circumstances damages. The jury returned a verdict in favor of Plaintiffs on their negligence claim and assessed damages in the amount of $305,737 for past economic damages, $1,525,418 for future economic damages, $1 million in past noneconomic damages, and $8 million in future noneconomic damages.
After judgment was entered, both parties filed numerous post-trial motions, The trial court granted Defendants’ motion to reduce the $9 million noneconomic damages award to $350,000 pursúant to section. 538.210,1. Both ■ parties appealed. Because Plaintiffs raise constitutional challenges to a state statute that are real and substantial, this Court has exclusive appellate jurisdiction.[2] Mo. Const, art. V, section 3.
II. Standard of Review
Plaintiffs’ first three points on appeal argue that the noneconomic damages cap in section 538.210 is unconstitutional. The interpretation of a statute is a question of law and is reviewed de novo. In re Care & Treatment of Coffman, 225 S.W.3d 439, 442 (Mo. banc 2007). Constitutional challenges to a statute are also issues of law that this Court reviews de novo. State v. Young, 362 S.W.3d 386, 390 (Mo. banc 2012).
In their final point on appeal, Plaintiffs claim that the trial court should not have granted a directed verdict on-the issue of aggravating circumstances damages. Defendants also raise claims relating .to the deferral or overruling of their motions for directed verdicts. The standard of review for a trial court’s decision to grant or overrule a motion for a directed verdict is whether the plaintiff made a submissible case. Investors Title Co., Inc. v. Hammonds, 217 S.W.3d 288, 296, 299 (Mo. banc 2007). A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. Id. at 299. When conducting its review, this Court views the evidence in the light most favorable to the plaintiff, and the plaintiff is given the benefit of all reasonable inferences. Lasky v. Union Elec. Co., 936 S.W.2d 797, 801 (Mo. *552 banc 1997); see also Keveney v. Missouri Military Academy, 304 S.W.3d 98, 104 (Mo. banc 2010). If the facts are such that reasonable minds could draw differing conclusions, the issue becomes a question for the jury, and a directed verdict is improper. Lasky, 936 S.W.2d at 801. If a party moves for judgment notwithstanding the verdict after a trial court overrules a motion for directed verdict, the jury’s verdict will be upheld unless there is a complete absence of probative facts to support the jury’s conclusion. Keveney, 304 S.W.3d at 104.
Defendants additionally allege error in the trial court’s failure to grant their motion for new trial, which was based in relevant part on the questioning of two defense witnesses. This Court reviews the overruling of a motion for a new trial for abuse of discretion. Kansas City v. Keene Corp., 855 S.W.2d 360, 372 (Mo. banc 1993). A new trial is available only when trial error, or misconduct of the prevailing party incited prejudice in the jury. Id. Likewise, substantial deference is given to the trial court’s determinations regarding the admissibility of evidence, which will not be disturbed absent an abuse of discretion. Id. The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration. Nelson v. Waxman, 9 S.W.3d 601, 604 (Mo. banc 2000).
Finally, Defendants argue that the trial court erred in giving jury instruction No. 4 over Defendants’ objections. Whether the jury was properly instructed is a question of law subject to de novo review. Fleshner v. Pepose Vision Institute, P.C., 304 S.W.3d 81, 90 (Mo. banc 2010). This Court reviews the evidence in the light most favorable to submission of the instruction. Edgerton v. Morrison, 280 S.W.3d 62, 65-66 (Mo. banc 2009). To reverse a jury verdict, the party claiming instructional error must show that: (1) the instruction as submitted misled, misdirected, or confused the jury; and (2) prejudice resulted from the instruction. Fleshner, 304 S.W.3d at 90-91.
III. Analysis
A. Plaintiffs’ Constitutional Challenges to Section 538.210

1. Plaintiffs’ Constitutional Claims were Properly Preserved for Review

Before addressing the merits of Plaintiffs’ constitutional arguments, it must first be determined whether the claims were preserved for appellate review. Defendants argue that Plaintiffs did not raise their constitutional challenges to section 538.210 at the earliest opportunity and,. thereby, failed to preserve those claims for review by this Court. Section 538.210.1 imposes a cap on noneconomic damages in the amount of $350,000.
To properly raise a constitutional challenge, a party must: (1) raise the constitutional question at the first opportunity; (2) state with specificity the constitutional provision on which the challenge rests, either by explicit reference to the article and section or by quoting the provision itself; (3) set forth facts showing the violation; and (4) preserve the constitutional question throughout the proceedings for appellate review. Mayes v. Saint Luke’s Hosp. of Kansas City, 430 S.W.3d 260, 266 (Mo. banc 2014). This rule is intended to prevent surprise to the opposing party and accord the trial court an opportunity to fairly identify and rule on the issue. Id.
Defendants cited section 538.210 in their answer to Plaintiffs’ petition, but they ac *553 knowledge that they did not plead it as an affirmative defense. Nonetheless, Defendants argue that Plaintiffs failed to raise their constitutional questions at the first opportunity because they did not raise the arguments in a reply to Defendants’ answer.
Although Plaintiffs could have theoretically raised their constitutional challenges at the pleading stage of the case in anticipation of a jury verdict awarding Plaintiffs noneconomic' damages in excess of the statutory cap, such action would serve no purpose. Section 538.210.1 has no application in a lawsuit unless an award exceeding the statutory cap is rendered. Until such time, the trial court would have no reason to rule on the constitutional validity of a statute whose application to the case in front of it is only hypothetical. The appropriate time for the court to hear and rule on arguments regarding the validity of section 538.210.1 is after the provisions of the statute are relevant to the lawsuit, i.e., after an award of noneconomic damages exceeding -the statutory ‘cap has been made. Prior to that time, arguments challenging the validity of section 538.210.1 or any ruling on that issue would be premature, and a rule necessitating that outcome would be nonsensical and inefficient.
In this case, Defendants moved for application of the noneconomic damages cap of section 538.210 after the jury returned its verdict. Plaintiffs timely filed their suggestions in opposition to the motion and raised their constitutional challenges to the cap, which are the subject of them appeal here. The trial court heard exhaustive arguments by both parties and issued its ruling granting Defendants’ motion. Defendants suffered no surprise that impeded their ability to effectively respond to Plaintiffs’ constitutional claims. Under the facts here, Plaintiffs timely raised their constitutional questions and thereby properly preserved them for appellate review.

2. The'Section 538.210 Noneconomic Damages Cap Does Not Violate the Right to a Jury Trial When Applied to Wrongful Death Cases

Plaintiffs contend that the trial court erred in applying the section 538.210 noneconomic damages cap because it violates the right to trial by jury.
Article I, section 22(a) of the Missouri Constitution provides “[t]hat the right of a trial by jury as heretofore enjoyed shall remain inviolate.” The Court has interpreted this provision to mean that the right to a jury trial is “beyond the reach of hostile legislation and [is] preserved” as it existed at common law before the state constitution’s first adoption in 1820. State ex rel. St. Louis, Keokuk & Nw. Ry. Co. v. Withrow, 133 Mo. 500, 36 S.W. 43, 48 (1896). The phrase “heretofore enjoyed” means that “the constitution protects the right as it existed when the constitution was adopted and does not provide a jury trial for proceedings subsequently created.” Hammons v. Ehney, 924 S.W.2d 843, 848 (Mo. banc 1996).
Sanders v. Ahmed squarely answers the question raised by Plaintiffs here. 364 S.W.3d 195 (Mo. banc 2012). In Sanders, the plaintiffs wife died as a result of the seizure medication prescribed by her doctor. Id. at 201. The jury found for the plaintiff, awarding him $920,745.88 in economic damages and $9.2 million in noneco-nomic damages. Id. at 202. On the defendant’s motion, the trial court reduced the noneconomic damages in accordance with the damages cap in section 538.210, RSMo 2000.[3] Id. On appeal, the plaintiff argued *554 that the' mandatory cap on noneconomic damages violated the right to a trial by jury under article I, section 22(a). Id. The Sanders. Court recognized that wrongful death is .a purely statutory cause of action that did. not exist at common law. Id. at 203. As a result, “the legislature has the authority to choose.what remedies will be permitted” because it created the cause of action. Id.. The.Court held that the.non-economic.,damages cap of section 538.210 did not violate article I, section 22(a) of the Missouri Constitution because the statute “merely placed limits on the amount of noneconomic damages recoverable under a statutorily created cause of action.” Id. at 204.
The facts of this case are- virtually indistinguishable from those in Sanders. In both cases, plaintiffs filed wrongful death medical malpractice actions, both sets of plaintiffs received jury awards in excess of the statutorily prescribed cap, and the trial courts accordingly reduced the noneco-nomic damages awarded in both cases to the maximum amount permitted by the statute. Sanders is directly on point, and its holding would seemingly-control the outcome of this case.
Nonetheless, Plaintiffs argue that Sanders is not dispositive.- ' First, Plaintiffs contend that Sanders upheld a pre-2005 version of séction 538.210 that is fundamentally different from the 2005 statute applicable to this case. Second, they argue that Watts v. Lester E. Cox Medical Centers, 376 S.W.3d 633 (Mo. banc 2012), not Sanders, actually controls the outcome of this case. Finally, they claim that section 538.213.1 is not severable and, consequently, that there was no valid statute for the trial court to apply in this case due to the holding in Watts, which held that the damages cap is unconstitutional when applied to common law personal injury claims. See id.
a. 2005 Amendments to Section 538.210 Do -Not Affect the Analysis in Sanders
Addressing each of these arguments in turn, Plaintiffs first claim that Sanders interpreted section 538.210 prior to its amendment in 2005. and that the 2005 statute is - fundamentally different from the previous version upheld in Sanders. Prior, to 2005, section 538.210 capped, noneco-nomic damages awards at $350,000 “per occurrence” and “per defendant.” Section 538.210.1, RSMo 2000. The pre-2005 version of section ■ 538.210 also permitted courts to adjust the cap for inflation. Id. The 2005 amendment limited the potential recovery to $350,000 “irrespective, of the number of defendants” and removed the adjustment for inflation. Section 538.210.1, RSMo Supp. 2013.
Sanders affirms the ability of the legislature to define the recovery available for a statutorily created wrongful death cause of action. 364 S.W.3d at 204. It did not discuss the specific limits on the recovery available under the previous version of section 538.210, nor did it give any indication that its- analysis would be altered if the legislature decided to place different limitations on plaintiffs under the statúte. This Court’s analysis 'in Sanders is not affected by any changes the legislature enacted regarding the recovery available under section 538.210. Consequently, Sanders controls in this case despite the 2005 amendment to the statute.
b. Sanders, Not Watts, Applies to Plaintiffs’ Claims
Next Plaintiffs argue that Watts, not Sanders, governs the outcome of this *555 case. They are incorrect. Watts involved a common law claim for personal injury (non-wrongful death) medical malpractice filed by a mother on behalf of her son. 376 S.W.3d at 636. She alleged that her son was born with catastrophic brain injuries due to the negligence of the doctors employed by the defendant hospital.- Id. A jury awarded the plaintiff $1.45 million' in noneconomic damages. The trial court entered judgment reducing that' award to $350,000 as required by section 538.210.[4] Id. The plaintiff challenged the statute as a violation of the right to a trial by jury guaranteed by article I, section 22(a) of the Missouri Constitution. Id. Thb Court found that the plaintiffs personal injury claim, including her claim for noneconomic damages, was a claim based in the common law and, therefore, was “not subject to legislative limits on damages*’ when the constitution was adopted in 1820. Id. at 638-39. The Court held that the statutory cap on damages in section 538.210 violated the right to a jury "trial as applied to medical malpractice actions alleging common law personal injury claims.' Id. at 640-41.
Watts did not overrule Sanders.[5] Instead, Watts differentiated common law causes of action as not being subject to legislative limits on the right to trial by jury. By its own terms, Watts applies to “cause[s] of action to which the right to jury trial attaches at common law.” Id. at 640. As the Court noted in Sanders, wrongful death actions were not recognized at common law in 1820 in Missouri but, instead, are creatures of statute. Because Plaintiffs’ action is for wrongful death, Sanders provides the correct analysis of their constitutional challenge,
Plaintiffs also contend that the right to a jury trial attaches to' á wrongful death claim even if such claims were not-cognizable at common law prior to 1820 and, therefore,' Watts still prohibits legislative limitations on jury awards in wrongful death cases. They look to State ex rel. Diehl v. O’Malley for support. 95 S.W.3d 82 (Mo. banc 2003). In Diehl, a plaintiff asserting claims under the Missouri Human Rights Act (MHRA) was denied the opportunity to try her case to a jury because her claims were- statutorily created and did not exist-at common law. Id. at 84-85.-■ This Court determined that the right to a jury trial attaches if the claim being asserted is “analogous' to” actions existing at common law prior to 1820 that carried the right to a jury trial. Id. at $6. Actions that -carried the right to a jury trial at common law were civil actions for damages. Id. at 92. Finding that the plaintiffs action, under the MHRA was “a civil action for .damages” “analogous to” the kinds of actions triable by juries prior to 1820, the Court held that the right to a jury trial attached and, consequently, the plaintiff had the right to try her case to a jury. Id. at 87-88, 92,. The analysis in Diehl, which focuses exclusively on whether the claimant brings a civil action for damages as . opposed to an equitable claim or an administrative action, is of no relevance in determining whether the constitutional right to a jury trial bars enforcement of legislatively created limitations on the amount of damages recoverable under a statutory wrongful death cause of action.
Instead, Sanders and Watts set forth a different analysis for determining whether the constitutional right to a jury trial is *556 violated by legislative caps on recoveries. In Sanders, the Court held:
The legislature has the power to define the remedy available if it creates the cause of action. The Court’s recent opinion in Overbey affirms:
[T]he legislature has the authority to choose what remedies will be permitted under a statutorily created cause of action....
The legislature in so doing, at least in regard to a statutorily created cause of action ... limited “the substance of the claims themselves,” as it has a right to do in setting out the parameters of a statutory cause of action.
Sanders, 364 S.W.3d at 203 (quoting Estate of Overbey v. Chad Franklin Nat’l Auto Sales N., LLC, 361 S.W.3d 364, 375 (Mo. banc 2012)) (emphasis added). As this Court stated in Sanders:
To hold otherwise would be to tell the legislature it could not legislate; it could neither create nor negate causes of action, and in doing so could not prescribe the measure of damages for the same. This Court never has so held and declines to do so now. The General Assembly has the right to create causes of action and to prescribe their remedies. The' General Assembly may negate causes of action or their remedies that did not exist prior to 1820. The judiciary has the duty to prescribe the trial process and to protect those rights to jury trial as existed prior to 1820.
364 S.W.3d at 205.
In Watts, on the other hand, the Court held that such caps “infringen on the right to trial by jury when applied to a cause of action to which the right to jury trial attaches at common law.” 376 S.W.3d at 640 (emphasis added).
Plaintiffs alternatively contend that Watts should control because Missouri did, in fact, recognize a wrongful death claim at common law prior to 1820. This Court has consistently rejected the existence of any common law cause of action for wrongful death.[6] Although Plaintiffs acknowledge this precedent, they insist that James v. Christy demonstrates that wrongful death claims did exist at common law in this state prior to the passage of the first wrongful death statute in 1855. 18 Mo. 162 (1853). Plaintiffs’ belief is misplaced. The action in James was initially brought by a father to recover for the lost services of his minor son due to the son’s death, which the father alleged was caused by the defendants. Id. at 163. The father died before the case went to trial, so the administrator of his estate pursued the claim in the father’s place. Id. at 163-64. The main issue in James was “whether the action survived to the administrator of the *557 deceased,” not whether Missouri recognized a wrongful death cause of action in tort. Id. at 164. This Court concluded that the cause of action could be- maintained by the administrator because it survived the father’s death under the Missouri statute governing the administration of estates. Id. Importantly, this Court held that the action survived because the father had “property in the services of his son during his minority.” Id. (Emphasis added).
Although the plaintiff in James was_, allowed to recover for the lost services of his son under common law, that action is not the same as an action for the wrongful death of his son. Missouri courts have repeatedly distinguished the “loss of services” action from a true wrongful death claim and have consistently held that a loss of services action akin to the one in James is not related to wrongful death claims. James is “an action for a wrong done to the property rights of the father”; it is “not [considered] an action for injuries to the person of the [father].” Stanley v. Bircher’s Ex’r, 78 Mo. 245, 248 (Mo.1883). Actions like James “rest upon entirely different principles, and involve rights arising out of the relation of parent and child, and [are] not questions of tort.” Hennessy v. Bavarian Brewing Co., 145 Mo. 104, 46 S.W. 966, 967 (1898).
As this Court stated in the decades immediately following James, “it is clear that, if the father in [James] had brought an action for the death of the infant son” rather than an action for loss of services, “he could not have recovered” because the case was decided two years prior to the enactment of the first wrongful death statute and “the death of a human being gave rise to no civil action [at common law] in behalf of any person .under, any circumstances.” Bates v. Sylvester, 205 Mo. 493, 104 S.W. 73 (1907). James is not evidence that Missouri recognized a wrongful death claim at common law because James is not a wrongful death case.
Further, modem statutory wrongful death claims are not' “analogous to” loss of services actions like the one in James, as Judge Teitelman’s dissent suggests. On the contrary, James rests “on the theory that the relationship between the plaintiff father and his minor son” is akin to “the contractual relationship of master and servant.” Mennemeyer v. Hart, 359 Mo. 423, 221 S.W.2d 960, 961 (1949). The father’s recovery in James flowed from the impairment of his property rights under that quasi-contractual relationship,[7] not from a tort claim based on the personal injury sustained by the son resulting in his death. See Hennessy, 46 S.W. at 967 (Mo.1898) (action for loss ,of services arises “ex contractu or in assumpsit,” not “in tort”); see also Stanley v. Vogel, 9 Mo.App. 98, 100 (Mo.App.1880) (the recovery in James “rested upon a breach of contract obligation, which breach involved injury to the property of the father”).
The loss of services action is not dependent on the death of- the minor child, nor doés it hinge on proof of negligence. See Berry v. Majestic Milling Co., 210 S.W. 434, 434-35 (Mo.1919). The loss-of services action in James, which sounds in contract, is not analogous to a modem wrongful death claim, which sounds in tort. They may both be civil actions for monetary damages» -but they arise from completely different principles of law.[8]
*558 In conclusion, this Court holds ohce more that Missouri does not recognize a common law wrongful death claim; additionally, the Court finds that' the statutory wrongful death claim is not “analogous to” a common law loss of services action. As such, Sanders, not Watts, still governs the analysis of Plaintiffs’ challenge to section 538.210,[9] The General Assembly has the right to create causes of action and to prescribe their remedies, and that is exactly what it has done here. The Court realizes that the jury’s award for Plaintiffs’ noneconomic damages for the loss of their young wife and mother will unfortunately be drastically lowered by the section 538.210 damages cap, Nonetheless, section 538,210 does not violate the right to a trial by jury as applied to wrongful death medical malpractice claims and so must be applied here.
c. Section 538.210 Is Severable
Plaintiffs finally argue that section 538,210.1 is not severable, so the entire noneconomic damages cap is invalid and cannot be applied to their claim. As noted above, Watts only invalidated section 538.210 to the extent that its limitations infringed on the right to a jury trial for common law personal injury actions. Watts, 376 S.W.3d at 636. If the invalid portion of the statute cannot be severed from the other provisions as Plaintiffs here contend, then the entirety of the provision would be invalid and unenforceable.
Upon a finding of invalidity as to one provision of a statute, courts are to presume that the legislature intended to give effect to the other parts of the statute that are not invalidated. Akin v. Dir. of Revenue, 934 S.W.2d 295, 300-301 (Mo. banc 1996). The presumption in favor of severability is codified at section 1.140, RSMo 2000:
The provisions of. every statute are sev-erable, If any provision of a statute is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of the statute are valid unless the court finds the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one; or unless the court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.
Accordingly, this Court must uphold valid portions of a statute despite the invalidity of other portions when: (1) after separating the invalid portions, the remaining portions are in all respects complete and susceptible of constitutional enforcement; and (2) the remaining statute is one that the legislature would have enacted if it had known that the rescinded portion was invalid. Simpson v. Kilcher, 749 S.W.2d 386, 393 (Mo. banc 1988).
*559 The relevant text of section 538.210.1 provides that, “[i]n any action against- a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services, no plaintiff shall recover more than three hundred fifty thousand dollars for- noneconomic damages irrespective of the number of defendants.” Watts declared this provision invalid as applied to common law personal injury claims. Watts, 376 S.W.3d at 636. By crossing out the words “personal injury,” the invalid portion of the statute is eliminated. The remaining provision still coherently and validly limits the recovery of noneconomic damages in any action against a health care provider for “death” arising out of medical negligence. See Sanders, 364 S.W.3d at 204. • The legislature has shown a clear intent to limit .the recovery of noneconomic damages in both personal injury and wrongful death cases against health care providers. There is no reason to conclude that that the legislature would choose not to limit recovery in wrongful death cases, when it validly may do so, simply because it could not similarly limit recovery in personal injury actions.

3. The Section 538.210 Noneconomic Damages Cap Does Not Violate Equal Protection

In their next point on appeal, Plaintiffs argue that the section 538.210 noneconomic damages cap denies wrongful death medical malpractice plaintiffs the equal protection of the law as guaranteed by both the federal and state constitutions. See U.S. CONST, amend. XIV, sec. 1; Mo. CONST, art.-I, sec. 2. They claim that, as a result of the holdings in Sanders and Watts, section 538.210 arbitrarily limits the recovery when medical malpractice resulted in the death of the patient, but allows unlimited recovery to persons who were only injured by medical malpractice.[10]
Missouri Constitution article I, section 2 and the 14th Amendment to the United States Constitution, guarantee equal rights and opportunities under the law. Comm. for Educ. Equality v. State, 294 S.W.3d 477, 489 (Mo. banc 2009). Thése guarantees do not mean that the state may never make distinctions between individuals or groups of people. As a practical necessity, most legislation makes distinctions among people for a variety of purposes. Overbey, 361 S.W.3d at 378 (Mo. banc 2012). The state may treat different groups differently, but to treat similarly situated persons differently it must have adequate justification. Comm. for Educ. Equality, 294 S.W.3d at 489.
If a law impacts a “fundamental right” or distinguishes between groups based on a “suspect classification,” it is subject to strict scrutiny, meaning that the state must justify' the -law by showing that it is necessary to accomplish a compelling state interest. Doe v. Phillips, 194 S.W.3d 833, 845 (Mo. banc 2006). Plaintiffs do not claim that wrongful death medical malpractice plaintiffs are a suspect class. They do allege, however, that the noneco- *560 nomic damages cap of section 538.210 impacts a fundamental right because it im-permissibly restricts the right to a jury trial. But this Court has already rejected that argument. See Sanders, 364 S.W.3d at 204. Plaintiffs can point to no fundamental right that is infringed by section 538.210. Alternatively, they argue that their claims should be analyzed under rational basis review, under which a law is adequately justified so long as it bears a rational relation to some legitimate state interest. Doe, 194 S.W.3d at 845.
Plaintiffs maintain that even under rational basis review, the noneconomic damages cap of section 538.210 does not pass constitutional muster because it now arbitrarily differentiates between wrongful death medical malpractice plaintiffs and the similarly situated group of personal injury medical malpractice plaintiffs due to the holdings in Sanders and Watts. They point out the illogic in limiting the recovery available when medical malpractice results in death while permitting unlimited recovery when the patient survives.
This Court rejected an equal protection challenge to the damages cap of section 538.210 in Adams By and Through Adams v. Children’s Mercy Hosp., 832 S.W.2d 898 (Mo. banc 1992).[11] The plaintiffs in Adams claimed that section 538.210 unconstitutionally denied medical malpractice plaintiffs the equal protection of the law by capping noneconomic damages in medical malpractice cases but not in other personal injury cases. Id. at 903-04. This Court acknowledged that section 538.210 treats parties in a medical malpractice lawsuit “much differently” than parties in other types of tort lawsuits by placing a cap on noneconomic damages in medical malpractice actions. Id. at 904. After determining that the statute did not involve a suspect class or infringe on any fundamental right, rational basis review was applied, noting that “[t]he fact that we think the legislature’s choices socially undesirable, unwise, or even unfair is of little consequence to our decision ... if the legislature’s classification advances the legislature’s legitimate policy.” Id. at 903.
Adams discussed at length the history of section 538.210 and its intended purpose of alleviating the perceived medical malpractice insurance crisis in the state:
The exact purpose of this classification is somewhat uncertain. Amici supporting the legislation tell us that the provisions of Chapter 538 were enacted in 1986 in an effort to address a perceived malpractice insurance crisis in the health care industry which in turn threatened the availability and affordability of health care services. According to Amicus Briefs in ■ support of the health care respondents, the legislature had before it information that the number of malpractice claims in Missouri increased 249 percent between 1981 and 1986; that aggregate and individual damage awards had accelerated to the extent that the state risked losing insurers; and that many physicians were believed to be considering leaving high risk areas of practice, potentially leaving many Missourians, particularly those in rural areas, without adequate medical protection. Thus, we are told that the primary goal of the General Assembly in *561 passing Chapter 538 was to confront a medical malpractice insurance crisis that threatened adversely to affect primary health' care in Missouri. Accordingly, the statute represents an effort by the legislature to reduce rising medical malpractice premiums and in turn prevent physicians and others from discontinuing “high risk” practices and procedures.
Both sides offer an array of evidence that both supports and refutes the existence of a “crisis” in medical malpractice premiums — enough evidence, in fact, that at the very least, it is a debatable proposition .that such a crisis does in fact exist.
Id. at 904. Despite the conflicting evidence as to the existence and severity of any medical malpractice insurance crisis, this Court found that the damages cap in section 538.210 was rationally related to a legitimate state interest:
Under equal protection rational review, this doubt must be resolved in favor of the General Assembly. While some clearly disagree with its conclusions, it is the province of the legislature to determine socially and economically desirable policy and to determine whether a medical malpractice crisis exists. Here, the preservation of public health and the maintenance of generally affordable health care costs are reasonably conceived legislative objectives that can be achieved, if only inefficiently, by the statutory provision under attack here.

Id.

As recognized in Adams, the legislature created the damages cap in an effort to reduce perceived rising medical malpractice premiums and prevent physicians from leaving “high risk” medical fields. It is not for this Court to evaluate the wisdom or desirability of the policy decisions made by the legislature when it . passed section 538.210.
. Section 538.210’s treatment of all medical malpractice plaintiffs remained the same until this Court decided Watts. This Court in Watts distinguished medical malpractice plaintiffs based on whether they brought a statutory wrongful death claim or a common law personal injury claim. The classification of medical malpractice plaintiffs that Plaintiffs complain of was not created by the legislature but is instead the result of this Court’s interpretation of article I, section 22(a) of the Missouri Constitution in Watts. This Court’s classification was driven by the constitutional provisions of this state. Plaintiffs do not challenge the constitutional provision itself as violating their equal protection rights. Instead, they challenge the Court’s interpretation of it. This argument does not properly raise an equal protection challenge.[12] See In re Bierman’s Estate, 396 S.W.2d 545, 547 (Mo.1965) (challenge to the court’s application of a statute rather than to the statute itself was but “mere alleged error in judicial ruling” and was “not sufficient to invoke the equal protection provision of the 14th Amendment”).
The noneconomic damages cap of section 538.210 does not deny Plaintiffs the equal protection of the law.

*562
Jf. The Section 538.210 Noneconomic Damages Cap Does Not Violate Separation of Powers

Plaintiffs finally argue that the section 538.210 noneconomic damages cap is unconstitutional because it violates separation of powers as required by article II, section 1 of the Missouri Constitution. Plaintiffs argue that the cap interferes with the judicial prerogative of remittitur, but they cite no Missouri authority in support of this argument other’ than the dissenting opinion in Sanders.
“It .is. difficult to point out the precise boundary which separates legislative from judicial duties.” Sanders, 364 S.W.3d at 204-205. This Court recognizes the wide discretion vested with the legislature in determining the means through which laws are executed.. Id, at 205.
This Court in Sanders rejected an argument that section 538.210 violates the separation of powers. Id. The legislature created the wrongful death cause of action, which was well within its power as the lawmaking authority of the state. See id. It follows that the legislature has the power to prescribe the remedy for the cause of action it created without infringing on the role and authority of the judiciary. “The limit on -damages within section 538.210 interferes neither with.the jury’s ability to render a verdict nor with the judge’s task of entering judgment; rather, it informs those duties.” Id. The noneconomic damages cap of section 538.210 does not impinge on the judicial power of remitter, and it does not violate separation of powers.
B. Parties’ Remaining Points On Appeal

1. The 'Trial Court Did Not Err in Granting Defendants’ Motion for Directed Verdict on Plaintiffs’ Claim for Aggravating Circumstances Damages at the Close of all the Evidence

Both parties allege error in the trial court’s actions concerning Plaintiffs’ claim for aggravating circumstances damages. Plaintiffs argue that the trial court should not have directed a verdict for Defendants on this claim. Defendants argue that the trial court was correct to grant their motion for “Directed Verdict at the Close of All Evidence” as to the aggravating circumstances damages claim. They claim, however, that the trial court committed reversible error by waiting until the close of all the evidence to do so when Defendants first moved for a directed verdict at the close of Plaintiffs’ evidence. Defendants argue that by failing to grant their motion when it was first made, the trial court forced''them to defend against the unmeritorious ’ claim for aggravating circumstances damages by putting on evidence of other dissections that Dr. Ferrara either observed or participated in, and that this evidence was irrelevant to the negligence claim against them and highly prejudicial to the defense. As both parties’ arguments concern the same issue, they will be addressed together.
To make a submissible case for aggravating circumstances damages against health care providers in a medical negligence action, a plaintiff must show that the health care provider demonstrated “willful, wanton or malicious misconduct with respect to his actions which are found to have injured or caused or contributed to cause the damages claimed in the petition.” Section 538.210.5. Section 538,205(10) defines “punitive damages” as those intended to punish or deter willful, wanton or malicious misconduct, which includes exemplary damages and damages for aggravating circumstances. To support a claim for aggravating circumstances damages or for punitive damages, the *563 plaintiff must present clear and convincing evidence at trial to support the claim. Lopez v. Three Rivers Elec. Co-op., Inc., 26 S.W.3d 151, 160 (Mo. banc 2000).
Defendants correctly- point out that damages for aggravating circumstances are not generally recoverable in negligence actions because “negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct.” Hoover’s Dairy, Inc. v. Mid-America Dairymen, Inc./Special Products, Inc., 700 S.W.2d 426, 435-36 (Mo. banc 1985). Nonetheless, both Missouri Approved Instruction (MAI) 10.02 and MAI 10.07 provide that punitive damages may be awarded for a negligent act or omission if the jury finds that the conduct of the defendant “showed complete indifference to or conscious disregard for the safety of others.” MAI 6.02 states that the same showing is necessary for an award of aggravating circumstances damages . in a wrongful death case when the theory of liability is negligence.[13]
Plaintiffs failed to prove that Dr. Fer-rara acted with complete indifference to or a conscious disregard for the safety of others. Plaintiffs introduced portions .of Dr. Ferrara’s videotaped deposition at trial. Dr. Ferrara indicated that he noticed the dissection in the left main coronary artery at approximately 3:53 p.m. He said he did not take immediate action to prepare to stent Ms. Dodson or to send her to the operating room for a bypass surgery because she was alert and vitally stable for a period of approximately 12 minutes after the dissection occurred. During that time, Dr. Ferrara: (1) called another-physician for assistance in determining whether to attempt to stent- Ms. Dodson; (2) called the operating room to inform the surgeons that they may need to perform a surgery on Ms. Dodson; and (3) performed a number of procedures to evaluate the- extent of the dissection and the condition of the right side of Ms. Dodson’s heart. Before assistance -arrived, Ms. Dodson reported severe chest pain and subsequently went in to cardiac arrest; Cardiopulmonary resuscitation (CPR) was administered to her, and' she came back to full alertness. 'At that point, Dr. Ferrara decided to insert an intra-aortic balloon pump, a device which is used to support'the heart. Once assistance arrived about 25 minutes after Dr. Ferrara first noticed the dissection, an attempt to-stent the artery was unfortunately unsuccessful. -
By the time Ms. Dodson got to the operating room, almost 48 minutes after Dr. Ferrara first noticed the dissection, she was once again in cardiac arrest and in need of CPR and chest compressions. .The surgeons who performed the bypass surgery stated in their videotaped depositions that they knew she had a poor chance of survival given her condition going into the -surgery.
All of Plaintiffs’ expert witnesses, as well as Dr. Ferrara and the physician who assisted him, agreed that a dissection was an emergent condition that required imme *564 diate attention. Dr. Ferrara testified about his understanding that, in the event of a total occlusion of the left main coronary artery, as apparently occurred here, one has approximately 30 minutes to reestablish blood flow before the cells of the heart muscle begin to die.
Plaintiffs failed to make a submissible case demonstrating that Dr. Ferrara acted with complete indifference to or conscious disregard for the safety of Ms. Dodson. The Plaintiffs’ own evidence indicates that Dr. Ferrara took affirmative action to address the dissection by placing a call to another physician for assistance and to the operating room and by inserting an intra-aortic balloon pump to support Ms. Dodson’s heart. The timeliness and appropriateness of Dr. Ferrara’s decisions may be questionable, but the evidence indicates that he did take steps to save Ms. Dodson’s life. His conduct may have been negligent, but it did not show a conscious disregard for Ms. Dodson’s safety.
This is not to say that the trial court erred by failing to grant Defendants’ motion for a directed verdict immediately after the close of Plaintiffs’ case. A directed verdict is a drastic measure that is not appropriate when the facts are such that reasonable minds could draw differing conclusions. Lasky v. Union Elec. Co., 936 S.W.2d 797, 801 (Mo. banc 1997). A defendant’s case may also be relevant to determining whether there is sufficient evidence to support an award for aggravating circumstances damages. A jury may conclude that an “aggressive defense at trial on either the issue of breach of duty or causation may supply” the element of complete indifference or conscious disregard necessary to an award of aggravating circumstances damages. Alcorn v. Union Pac. R.R. Co., 50 S.W.3d 226, 248 (Mo. banc 2001).
The record here reflects that, at the close of Plaintiffs’ case, the trial court was unsure whether Plaintiffs had made a sub-missible case for aggravating circumstances damages, which indicates that reasonable minds could differ as to whether Plaintiffs had established the requisite elements at that point. The trial court did not err in delaying a decision on Defendants’ motion for “Directed Verdict at the Close of All Evidence” until after it heard Defendants’ case.

2. The Trial Court Did Not Abuse Its Discretion By Overruling Defendants’ Objection to the Questioning of Defendants’ Expert Witness

Defendants next argue that the trial court committed reversible error by overruling their objection to Plaintiffs’ questioning of one of the expert witnesses for the defense. They claim that the questioning introduced irrelevant and prejudicial information into the trial and imper-missibly impugned the credibility of all doctors from the St. Louis area, including other expert witnesses called by the defense. In response to a question asking whether the witness had reviewed potential medical negligence eases for plaintiffs, he stated:
I don’t think I’ve been requested to answer — to review any for plaintiffs, at least that I recall recently. I’ve done it in the past, and I do — and have been consulted by attorneys about some that I’ve said that I think they do or do not have a case and referred them to — if they’re in the St. Louis area, it would be bad for my referral practice to be testifying against local physicians. If I think they have a case, I refer those attorneys to out-of-state physicians who could provide them the guidance they need.
Defendants did not object at this point in the questioning. Plaintiffs’ counsel followed up with further questions regarding *565 the witness’s volunteered testimony that he did not act as a witness against other St. Louis doctors because doing so would be bad for his referral business. Ultimately, Plaintiffs’ counsel asked, “[I]f folks in St. Louis can’t get St. Louis doctors to come in and testify to the truth, what they felt in their heart, feel was handled wrong by a physician in St. Louis, how can we— how can anybody in St. Louis get the care that we are entitled to?” Before Plaintiffs’ counsel finished the question, Defendants objected, arguing that the line of questioning was irrelevant and prejudicial. The trial court overruled the objection and allowed Plaintiffs’ counsel to ask the question.
This Court finds no abuse of discretion here. Evidence-of the interest or bias of a witness and his relation to or feeling toward a party is always relevant. Mitchell v. Kardesch, 313 S.W.3d 667, 676 (Mo. banc 2010). Attorneys are given wide latitude to test the qualifications, credibility, skill or knowledge, and value and accuracy of opinions given by an expert witness. Nelson v. Waxman, 9 S.W.3d 601, 604 (Mo. banc 2000). When he stated in court without objection that testifying against local St. Louis doctors would be bad for his referral business, the witness opened the door to further questioning. This matter was relevant to the issue of his bias in this case as he was testifying in favor of Dr. Ferrara, a St. Louis doctor.[14]

3. The Trial Court Did Not Abuse Its Discretion By Overruling Defendants’ Objection to the Questioning of Dr. Ferrara

Defendants additionally claim that the trial court abused its discretion in allowing Plaintiffs to play a portion of Dr. Ferrara’s deposition and in failing to grant Defendants’ motion for new trial for the same reason. In the relevant section of the deposition, Dr. Ferrara stated that he did not speak to the surgeons who performed Ms. Dodson’s unsuccessful bypass surgery to inquire about the results. Defendants argue that this material was irrelevant and prejudicial. This Court disagrees.
As noted above, there is wide latitude to test the qualifications, credibility, skill or knowledge, and value and accuracy of opinions by an expert witness on cross-examination. Nelson, 9 S.W.3d at 604. Generally, the credibility of witnesses is always, a relevant issue in a laws.uit. Mitchell, 313 S.W.3d at 676. Dr. Ferrara offered opinions regarding the events leading up to Ms. Dodson’s death and the cause of her death. Whether he spoke with the surgeons who attempted to operate on Ms. Dodson is relevant to his credibility as a witness and the value of his opinion on those.matters. The answer to this question informs the jury what information Dr. Ferrara did or did not take into account when forming his opinions. There was no abuse of discretion in admitting this videotaped testimony.
A The Trial Court Did Not Err in Giving Instruction No. I to the Jury
Defendants also argue that the trial court committed reversible error by *566 giving instruction- No.. 4, which directed the jury not to consider insurance coverage while deliberating on the case.[15] Defendants claim that, .'because Plaintiffs introduced evidence of Ms. Dodson’s , health insurance benefits, the instruction was irrelevant and gratuitously injected the issue of insurance into the case.. They are incorrect.
The improper injection of insurance coverage in a jury-tried case may constitute reversible error, especially if reference to the issue of insurance is done purposefully or in bad faith. Means v. Sears, Roebuck & Co., 550 S.W.2d 780, 787 (Mo. banc 1977). Defendants argue that the only mention of insurance in the trial occurred when Plaintiffs introduced evidence of the decedent’s health insurance benefits to 'establish Plaintiffs’ economic damages. Plaintiffs then requested an instruction directing the jury not to consider the issue of insurance coverage. Defendants contend that, as such, instruction No. 4 served no real purpose in the case except to impermissibly and needlessly remind the jury of the existence of insurance.
Even if the testimony regarding' Ms. Dodson’s health insurance benefits was the only mention of insurance in the case, Defendants give no explanation as to how the instruction prejudiced them. If there is any ambiguity in giving this instruction where loss of health insurance benefits is claimed as an element of damages by Plaintiffs, the instruction could only have inured to the benefit of Defendants because it instructs the jury to disregard the existence of the insurance.
Further, the record reflects at least two other mentions of insurance. First, during voir dire, a juror made unsolicited comments that insurance companies pay for medical malpractice claims and that juries often give large awards for medical 'malpractice plaintiffs because they know the defendant doctors and hospitals are insured. Second, a hospital bill was admitted into evidence, revealing the. original amount owed for Ms. Dodson’s medical care as well as the amount actually paid with insurance.
MAI 2.07 is intended to prevent the jury from considering insurance coverage in cases- in' which such matters are irrelevant and potentially prejudicial to one or both of the ’parties,[16] No argument is made here that insurance coverage was a relevant issue in the case outside of Plaintiffs’ calculation of their economic damages. There was no error in giving instruction No. 4 to the jury.

5, The Trial Court Did Not Err in Overruling Defendants’ Motion for Directed Verdict, for Judgment Notwithstanding the Verdict, and for a New Trial on Plaintiffs’ Claim for Future Economic Damages

Finally, Defendants argue that the trial court should have granted their motions for directed verdict, for judgment notwithstanding the verdict, and for a new trial because Plaintiffs failed to prove their *567 future economic damages to a degree of reasonable certainty. In particular, Defendants claim that-the evidence regarding Ms. Dodson’s future earning capacity and the value of her' health insurance benefits was too speculative to support the jury’s verdict.
A plaintiff is entitled to full compensation for past or present injuries that the plaintiff has' shown by a preponderance of the evidence were caused by the defendant. Swartz v. Gale Webb Transp. Co., 215 S.W.3d 127, 130-31 (Mo. banc 2007). The ultimate test for damages is whether the award will fairly arid reasonably compensate the plaintiff for his or her injuries. Sampson v. Missouri Pac. R. Co., 560 S.W.2d 573, 588 (Mo. banc 1978). Damages for loss of future earnings must be established with-reasonable certainty through the introduction of substantial evidence. Id. at 589. They may not be based on conjecture or speculation. Id. Absolute certainty in predicting future economic damages is not required, however. See id. This Court has recognized that “[i]nevitably there is a degree of speculative nature to the determination of a fairly approximated present-value .award compensating plaintiff for what he would have earned.” Id. Such-inherent uncertainty does not improperly influence, a jury’s verdict when the evidence “afford[s] the jury a basis for a reasonable estimate” of .the amount of the plaintiffs, future losses. Messina v. Prather, 42 S.W.3d 753, 765 (Mo.App.2001).
Plaintiffs’ evidence of future economic damages consisted bf the testimony of Ms. Dodson’s supervisor, Mr. Dodson, and an economic' expert retained by Plaintiffs. The- testimony indicated that the decedent, Ms., Dodson,- worked as an assistant for a' property management group and earned approximately $42,000 annually, that Ms. Dodson was an excellent employee, that it was reasonable to expect that Ms. Dodson would likely have received- a promotion in the next year with a $3,000 pay increase, and that within five years, Ms. Dodson would likely have earned as much as $55,000 per year. The testimony was based on the supervisor’s 33 years of experience in the field of commercial property management and her personal knowledge of Ms. Dodson.
' Mr. Dodson testified that his three chil-' dren had been insured through Ms. Dodson’s’work because it[1]-was significantly more expensive to insure them through his employer’s insurance. The expert testified that he estimated the additional cost to the family of insuring the children on Mr. Dodson’s insurance policy to be about $500 per month based on the information he had been provided, and that this information was of the kind traditionally relied upon by experts in performing these Calculations.
The testimony provided facts regarding Ms. Dodson’s career, skills, and annual income at the time of her death from which the jury could reasonably estimate the future earnings of Ms. Dodson. This was the best evidence of these facts due to .the supervisor’s great experience in the field of commercial property management and her personal knowledge of Ms. Dodson’s work abilities. Additionally, the expert testimony regarding Ms. Dodson’s health benefits and estimated future earnings was reasonably certain and definite and was properly based on- the sources economists traditionally rely on in estimating future economic. damages. This testimony provided a sufficiently certain foundation upon which the jury could reasonably estimate the ■ future economic damages suffered by Plaintiffs.
IV. Conclusion
This Court recognizes the inadequacy of $350,000 to compensate the Dodson family *568 for the tragic death of their loved one, particularly in light of the amount awarded by the jury. It is not for this Court to question the policy determinations of the General Assembly, however, and the Court is bound to apply the law as written by the legislative branch. Accordingly, the judgment of the trial court is affirmed.
Breckenridge, C.J., and Stith, J., concur; Fischer and Wilson, JJ., concur in result in separate opinion filed; Draper, J., dissents in separate opinion filed; Teitelman, J., concurs in opinion of Draper, J.; Teitelman, J., dissents in separate opinion filed.

. Unless otherwise indicated, all statutory references are to RSMo Supp. 2013.

. Additional relevant details regarding the facts of the case and the proceedings at trial ■ will be discussed in the analysis section below.

. Section 538.210 was amended in 2005. The action in Sanders accrued prior to the date of that amendment, so the earlier version of the statute applied in that case. Because *554 Plaintiffs’ injury here arose after 2005, the amended statute governs their cause of action. As will be discussed in more detail below, the legislature amended section 538,210 again in 2015.

. Due to the date of the alleged negligence in Watts, the 2005 amendment to section 538.210 was applicable to Watts's claims.

. Watts does not mention Sanders. This Court presumes that, absent a contrary showing, an opinion of the Court has not been overruled sub sihntio. See State v. Honeycutt, 421 S.W.3d 410, 422 (Mo. banc 2013).

. See, e.g., McNamara v. Slavens, 76 Mo. 329, 330 (Mo.1882); Barker v. Hannibal & St. Joseph R. Co., 91 Mo. 86, 14 S.W. 280, 281 (1886); Hennessy v. Bavarian Brewing Co., 145 Mo. 104, 46 S.W. 966, 967 (1989); Allen v. Dunham, 188 Mo.App. 193, 175 S.W. 135, 137 (1915); Clark v. Kansas City, St. L. & C.R. Co., 219 Mo. 524, 118 S.W. 40, 45 (1909); Jordan v. St. Joseph Ry., Light, Heat & Power Co., 335 Mo. 319, 73 S.W.2d 205, 212 (1934); Cummins v. Kansas City Public Service Co., 334 Mo. 672, 66 S.W.2d 920, 922 (1933); Demattel v. Missouri-Kansas-Texas R. Co., 345 Mo. 1136, 139 S.W.2d 504, 505 (1940); Baysinger v. Hanser, 355 Mo. 1042, 199 S.W.2d 644, 647 (1947); Knorp v. Thompson, 352 Mo. 44, 175 S.W.2d 889, 895 (Mo.1943); Plaza Exp. Co. v. Galloway, 365 Mo. 166, 280 S.W.2d 17, 21-22 (1955); Nelms v. Bright, 299 S.W.2d 483, 487 (Mo. banc 1957); Frazee v. Partney, 314 S.W.2d 915, 918 (Mo.1958); Glick v. Ballentine Produce, Inc., 396 S.W.2d 609, 613-14 (Mo.1965), overruled on other grounds by Bennett v. Owens-Corning Fiberglas Corp., 896 S.W.2d 464 (Mo. banc 1995); Sanders v. Ahmed, 364 S.W.3d 195, 203 (Mo. banc 2012).

. Of course, modem society no longer views children as "servants” of their fathers. See Mennemeyer, 221 S.W.2d at 962.

. Judge Teitelman’s dissent also relies on language in James indicating that, had the father lived to bring suit himself, he could potentially have recovered for “the loss of society or *558 comforts afforded by a child to his, parent.” James, 18 Mo. at 164, Reliance on this state- ’ ment is misplaced, The question before the Court in James was whether the- father’s loss of services action survived to the administrator, not what damages are recoverable in such an action. Id. at 162-63, The Court's discussion of the damages potentially recoverable had the father brought suit himself is not supported by any authority and is mere dicta, as it is not essential to the holding of the case,

. Judge Teitelman's dissent would have this Court overrule Sanders, a case decided only four years ago, to reach the dissent’s intended result. The principles of legislative deference as well as stare decisis should be respected, and previous decisions of this Court should ,not be overruled lightly. Boland v. Saint Luke's Health System, Inc., 471 S.W.3d 703, 711 (Mo. banc 2015).

. It is noted that during the 2015 session, the legislature stated in a truly agreed to and finally passed bill that it was abrogating any common law cause of action arising out of personal injury for medical malpractice claims and creating a statutory cause of action in its place. Section 538,210, RSMo Supp.2015. Because the legislature recognized the inadequacy of a $350,000 cap in cases involving catastrophic injury or death, the statute now caps noneconomic damages for personal injury at $400,000 per plaintiff and for wrongful death or "catastrophic personal injury” at $700,000 per plaintiff. Id. The 2015 legislation also adjusted the limitations on awards for noneconomic damages upward by 1.7 percent annually to account for inflation. Id. This amendment is not before the Court in this case,

. Adams involved a number of constitutional challenges to the noneconomic damages cap of section 538.210 as applied to a personal injury medical malpractice action, including claims that it violated equal protection and the right to a jury trial. Adams, 832 S.W.2d at 900. Adams held that the statute did not violate the right to a trial by jury even though the plaintiff asserted a common law personal injury claim. Id. at 907. Watts overruled Adams only "to the extent that it holds that the section 538.210 caps on noneconomic damages do not violate the right to trial by jury” when applied to personal injury claims that existed at common law. Watts, 376 S.W.3d at 646.

. In any event, plaintiffs whose family member was killed by medical negligence are not similarly situated to plaintiffs who — themselves — were injured by medical negligence. The former have no common law cause of action, the latter do. It this distinction which accounts for the differences between Watts, on one hand, and Sanders and the present case on the other. Because the two classes of plaintiffs are not similarly situated With respect to Missouri's constitutional right to a jury trial, there can be no equal protection violation either in the constitutional provision or this Court’s application of it.

. Defendants argue that, because chapter 538 does not contain its own definition of "willful, wanton or malicious' misconduct," this Court should turn to a dictionary to determine the plain meaning of these words. They contrast the dictionary definitions of "willful," "wanton," and "malicious" with the definition of the word "reckless,” apparently in an attempt to argue that recklessness cannot be the foundation of an award for aggravating circumstances damages in actions filed under chapter 538. Defendants provide no reason why a claim for aggravating circumstances damages under chapter 538 should be analyzed differently from other wrongful death claims, nor do they dispute the standard for punitive damages or aggravating' circumstances damages as set forth in MAI 10.02, MAI 10.07, and MAI 6.02.

. Even if this Court were' to find that the trial court erred in permitting this line of questioning, no prejudice to Defendants resulted. After Plaintiffs' counsel asked how citizens of St. Louis could get the care they needed if St. Louis doctors were unwilling to testify against each other, the witness was allowed to explain at length that this practice was uniform across the country, and that when he received requests from medical malpractice plaintiffs, he would send them to qualified out-of-town experts who would not have any conflict of interest in testifying for the plaintiffs. There is no prejudice evident ’ from this record.

, Instruction No. 4 followed verbatim the text of MAI 2,07, which reads:
The existence or non-existence of any type of insurance, benefit, right or obligation of repayment, public or private, must not be . considered or discussed by any of you in . arriving at your verdict, Such matters are not relevant to any of the issues you must decide in this case.

. As comments to MAI 2.07 note, the instruction would not be appropriate in certain cases in which insurance coverage is a relevant issue at trial, such as bad faith insurance cases, vexatious refusal to pay cases, and insurance coverage cases.

. Adams was overruled on other grounds by Watts v. Lester E. Cox Med. Centers, 376 S.W.3d 633 (Mo. banc 2012).