

# SUPREME COURT OF MISSOURI
## en banc

*Opinion issued April 5, 2022*

| | | |
|---|---|---|
| ALL STAR AWARDS & AD SPECIALTIES, INC., | ) ) ) | |
| Appellant-Respondent, | ) ) | |
| v. | ) ) | No. SC99007 |
| HALO BRANDED SOLUTIONS, INC., | ) ) ) ) | |
| Respondent-Appellant. | ) ) | |

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
### The Honorable John M. Torrence, Judge

All Star Awards & Ad Specialties Inc. appeals the reduction of a jury's punitive damages award against HALO Branded Solutions, Inc. The jury awarded All Star $25,541.88 in actual damages after finding All Star's employee, Doug Ford, breached his duty of loyalty to All Star and HALO conspired with Ford to breach this duty of loyalty. The jury also found Ford and HALO tortiously interfered with All Star's business and awarded All Star $500,000 in actual damages.[1] Finally, the jury assessed $5.5 million in punitive damages against HALO. The circuit court thereafter reduced the punitive

---

[1] Ford is not a party to this appeal or cross-appeal.

damages award to $2,627,709.40 pursuant to section 510.265.[2]  All Star contends the application of the statutory punitive damages cap found in section 510.265 violated its right to a jury trial.

HALO cross-appeals.  In three multifarious points relied on, HALO contests the circuit court's rulings: (1) overruling HALO's motion for directed verdict and partially overruling its motion for judgment notwithstanding the verdict ("JNOV") as to the tortious interference claim; (2) allowing All Star to submit the issue of future damages to the jury as to the tortious interference claim; (3) permitting All Star to introduce an exhibit as evidence of lost profits; (4) refusing to strike testimony regarding that exhibit and regarding lost profits; (5) overruling HALO's motions for directed verdict and JNOV because punitive damages were not submissible; (6) overruling, in part, HALO's motion to reduce punitive damages because All Star failed to make a submissible case for punitive damages; and (7) overruling, in part, HALO's motion to reduce punitive damages because even the reduced punitive damages award violated due process.

Despite All Star and HALO's various challenges, the circuit court's application of the punitive damages cap in section 510.265 did not violate All Star's right to a jury trial, and the reduced award did not violate HALO's due process rights.  This Court declines to review the remaining arguments HALO raises on appeal, as they fail to comply with Rule 84.04.  The circuit court's judgment is affirmed.

---

[2] All statutory references are to RSMo 2016 unless otherwise indicated.

2

## Factual and Procedural History[3]

Both HALO and All Star sell branded promotional products and offer other branding services to their clients. HALO is a large, full-service promotional products distributor employing about 2,000 people. HALO is an expanding company; its expansion comes, in part, from hiring other promotional companies' account executives who have preexisting clients. All Star is a small, family-operated business that employs about 20 people. All Star employees build client relationships, but those clients belong to All Star and not individual employees.

All Star hired Doug Ford in 1994. In early 2018, Ford informed All Star he intended to take a sales position with HALO. But, unbeknownst to All Star, Ford had begun working for HALO before the end of 2017 and had surreptitiously engaged in several activities intended to benefit HALO. At HALO's request, Ford sent HALO confidential information about All Star customers. Ford also informed his All Star clients of his impending move to HALO; transferred customer orders to HALO; acquired promotional artwork and files from All Star for HALO; and induced All Star employees to prepare material, such as customer reports, that Ford intended to share with HALO.[4] Ford did these things in coordination with HALO's management and staff. All Star, then unaware of Ford's

---

[3] The facts are presented in the light most favorable to the jury's verdict, giving All Star the benefit of all reasonable inferences and disregarding any evidence and inferences that conflict with the verdict. *Est. of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 371 (Mo. banc 2012).

[4] While Ford was employed at All Star, HALO processed orders from All Star clients, including several who no longer do business or have reduced their annual promotional orders with All Star. Ford promised HALO he could transfer $450,000 in sales from All Star, and a HALO regional vice president increased this expectation to $550,000.

activities, agreed to allow Ford to stay on until he officially started working for HALO. About a week after Ford gave his notice, All Star discovered evidence of Ford's activities and terminated him. All Star demanded HALO cease processing orders from All Star clients, but HALO refused. Instead, HALO processed orders only from All Star customers with whom Ford had a longstanding prior relationship.

In March 2018, All Star sued Ford and HALO. A jury found HALO tortiously interfered with All Star's business expectancy. The jury also found Ford breached his duty of loyalty to All Star and HALO conspired with Ford to breach this duty of loyalty.[5] The jury awarded All Star $525,541.88 in actual damages for both claims. All Star further alleged HALO acted with an evil motive or reckless indifference and sought punitive damages. In a bifurcated proceeding, the jury assessed $5.5 million in punitive damages against HALO.[6] The circuit court subsequently accepted the jury's verdicts and award of actual and punitive damages against HALO and entered judgment for All Star. Following HALO's motion for JNOV, new trial, and remittitur, the circuit court applied section 510.265 and capped the punitive damages award at five times All Star's actual damages, or $2,627,709.40, but otherwise overruled HALO's motions and entered final judgment in accordance with the jury's verdicts. All Star appealed; HALO cross-appealed. After an opinion by the court of appeals, this Court transferred the case pursuant to article V, section 10 of the Missouri Constitution.

---

[5] The jury found in All Star's favor on Ford's counter-claim for unpaid commissions.
[6] The jury also assessed $12,000 in punitive damages against Ford.

**Analysis**

I. All Star's Claims

All Star raises four points on appeal, all challenging the circuit court's reduction of the $5.5 million punitive damages award. This Court need only consider All Star's first two arguments related to the application of the punitive damages cap in section 510.265, as they are dispositive.[7]

a. The Right to Trial by Jury and Punitive Damages Caps

Article I, section 22(a) of the Missouri Constitution states "the right of trial by jury as heretofore enjoyed shall remain inviolate." This provision endows litigants pursuing legal claims today with the right to a jury trial if they would have enjoyed such right at common law when the Missouri Constitution was first adopted in 1820. *Dodson v. Ferrara*, 491 S.W.3d 542, 553 (Mo. banc 2016). The phrase "as heretofore enjoyed" as used in article I, section 22(a), however, limits the modern scope of the right to trial by jury. *Watts v. Lester E. Cox Med. Ctrs.*, 376 S.W.3d 633, 638 (Mo. banc 2012). "The phrase heretofore enjoyed means that the constitution protects the right as it existed when the constitution was adopted and does not provide a jury trial for proceedings subsequently created." *Dodson*, 491 S.W.3d at 553 (internal quotation omitted). The right applies only

_____

[7] In its third and fourth points relied on, All Star argues the circuit court erred by reducing the $5.5 million punitive damages award based on HALO's due process and remittitur arguments. Because the circuit court was justified in relying on section 510.265 to reduce the award, this Court declines to address All Star's challenges related to due process and remittitur. While the circuit court's order stated it reduced punitive damages based on both section 510.265 and due process, this Court is primarily concerned with the correctness of the circuit court's result, not the route taken to reach that result. *See Bus. Men's Assur. Co. of Am. v. Graham*, 984 S.W.2d 501, 506 (Mo. banc 1999).

to causes of action that would have been tried by a jury when the Missouri Constitution was adopted in 1820.[8] *Id.* In 1820, juries were authorized to assess punitive damages for common law tort claims, and statutory caps on punitive damages did not exist. *Lewellen v. Franklin*, 441 S.W.3d 136, 143 (Mo. banc 2014) (noting "imposing punitive damages was a peculiar function of the jury"); *see also Day v. Woodworth*, 54 U.S. 363, 371, 13 (1851) (observing assessing damages by way of punishment "has been always left to the discretion of the jury").

In 2005, the Missouri legislature enacted section 510.265, which caps the amount of punitive damages litigants can recover.[9] Statutory caps on punitive damages violate the right to a trial by jury as provided by article I, section 22(a) if the litigant's common law cause of action existed in 1820 and the claim would have supported a finding of punitive damages in 1820. *Lewellen*, 441 S.W.3d at 143; *Dodson*, 491 S.W.3d at 557; *Overbey*, 361 S.W.3d at 375. Statutory caps on punitive damages also violate the right to a trial by jury as provided by article I, section 22(a) if the litigant's common law cause of action is "analogous" to a claim that existed in 1820 and the claim would have supported a finding of punitive damages in 1820. *Dodson*, 491 S.W.3d at 553. But, if the particular legal cause of action did not exist or if the modern common law claim is *not* sufficiently "analogous"

---

[8] "Missouri's common law is based on the common law of England as of 1607," so litigants may support their right to jury trial claim with authority either from this state or from seventeenth-century England. *Watts*, 376 S.W.3d at 638; *see also* § 1.010.

[9] Section 510.265.1 limits the award of punitive damages to the greater of:
    (1) Five hundred thousand dollars; or
    (2) Five times the net amount of the judgment awarded to the plaintiff against the defendant.

6

to a claim existing in 1820, then article I, section 22(a) does not guarantee litigants the right to have a jury make an unlimited determination of damages, and the legislature may enact statutory limits on punitive damages. *Watts*, 376 S.W.3d at 638. Finally, if the legal claim or analogous legal claim was cognizable in 1820 but did not support the assessment of punitive damages in 1820, then article I, section 22(a) does not ensure a modern litigant the right to a jury's determination of unlimited damages on that claim and the legislature may enact statutory limits on punitive damages. *See Dodson*, 491 S.W.3d at 558 ("The phrase heretofore enjoyed means that the constitution protects the right as it existed when the constitution was adopted." (internal quotation omitted)).

In its appeal, All Star contends the circuit court violated its right to trial by jury as guaranteed by Missouri's Constitution because it reduced the jury's punitive damage award pursuant to the statutory cap on punitive damages found in section 510.265. All Star asserts that, in applying the statutory punitive damages cap, the circuit court misapplied this Court's prior precedent. All Star maintains "the applicable analysis is not whether the plaintiff's claims are 'common law claims,' and is instead whether … civil conspiracy to breach the duty of loyalty and tortious interference with business expectancy [ ] are civil actions for damages involving a fact issue" for which a jury would have had limitless power to decide punitive damages in 1820 when Missouri's Constitution was first adopted.

All Star contends its legal claims against HALO are not subject to the statutory punitive damages cap in section 510.265 because the factual "nature" of both claims support causes of action for which juries determined damages before 1820. Specifically, All Star claims its civil conspiracy to breach the duty of loyalty and tortious interference

7

with business expectancy claims against HALO are, in essence, actions for trespass or fraud encompassing a variety of claims for wrongs to person and property tried without limitation to juries in 1820. All Star's arguments lack merit and contravene the precedent to which it cites. Utilizing the analysis dictated by our cases, the relevant inquiry examines the cause of action, not the facts supporting the cause of action, as All Star contends. *See Dodson*, 491 S.W.3d at 557 (finding a statutory limit on punitive damages constitutional as applied to the modern statutory wrongful death claim because such claim is not analogous to a common law loss of services claim). Having articulated the correct framework to analyze the issue, this Court assesses the modern, common law causes of action brought in this case—civil conspiracy to breach the duty of loyalty and tortious interference with business expectancy—to determine if these claims existed or are sufficiently analogous to common law legal claims existing in 1820 and would have supported a punitive damage award in 1820. *See Dodson*, 491 S.W.3d at 555.

"This Court reviews constitutional challenges *de novo*." *Lewellen*, 441 S.W.3d at 143. This Court presumes a statute is valid and declares it unconstitutional only when the statute's challenger demonstrates a clear violation of the constitution. *Id.*

b. Conspiracy to Breach Ford's Duty of Loyalty

All Star's civil conspiracy to breach the duty of loyalty claim is rooted in the law of contracts and would not have supported a punitive damages award in 1820. Civil conspiracy is a common law tort. *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. banc 1999). Even assuming civil conspiracy as it exists today is largely the same as its seventeenth-century English counterpart and nineteenth-century Missouri counterpart,

8

a civil conspiracy does not exist independent of an underlying claim. *Id.* ("In Missouri, if tortious acts alleged as elements of a civil conspiracy claim fail to state a cause of action, then the conspiracy claim fails as well."). This Court, therefore, must determine how Missouri courts would have characterized the duty of loyalty claim in 1820.[10]

All Star attempts to position its duty of loyalty claim as arising under either trespass or fraud, and notes, under common law, a master could bring an action in damages against a servant in the master's employ for an employee's disclosure of the master's secrets learned in the course of employment. The master's cause of action to which All Star refers, however, did not arise from fraud, trespass, or any other kind of tort:

> With us in England the several units, or remedial instruments of justice, are … distinguished into three kinds: actions *personal*, *real*, and *mixed*.
>    *Personal* actions are such whereby a man claims a debt, or personal duty, or damages in lieu thereof; and, likewise, whereby a man claims satisfaction in damages for some injury done to his person or property. The former are said to be founded on contracts, the latter upon *torts* or wrongs …. Of the former nature are all actions upon debt or promises[.]

Blackstone, William, *Commentaries on the Laws of England, Book the Third* 1113 (Lewis's ed. 1900) (emphasis in original) (footnote omitted). In 1820, an employee's common law duty of loyalty was conceptualized as an implied contract or promise, the breach of which was ordinarily remedied by an action of "assumpsit" or any other action to enforce a contractual right:

> A second class of implied contracts are such as do not arise from the express determination of any court, or the positive direction of any statute; but from natural reason, and the just construction of law. Which class extends to all

---

[10] To do otherwise would permit litigants to use civil conspiracy as a Trojan horse, masking any common law claim created or substantially altered after 1820 to evade section 510.265's damages cap.

presumptive undertakings or *assumpsits;* which though never perhaps actually made, yet constantly arise from the general implication and intendment of the courts of judicature, that every man hath engaged to perform what his duty or justice requires.

....

… The last class of **contracts**, implied by reason and construction of law, arises upon this supposition, that every one [sic] who undertakes any … employment, trust, or duty, contracts with those who employ or intrust [sic] him, to perform it with integrity, diligence, and skill.

*Id*. at 1154, 1156 (second emphasis added).[11]   All Star does not assert any authority

suggesting litigants could demand punitive damages for breaches of contractual causes of

---

[11] All Star relies on a different portion of Blackstone's commentaries:

> Also if any person do hire or retain my servant, being in my service, for which the servant departeth from me and goeth to serve the other, I may have an action for damages against both the new master and the servant, or either of them: but if the new master did not know that he is my servant, no action lies; unless he afterwards refuse to restore him upon information and deman [d]. The reason and foundation upon which all this doctrine is built, seem to be the property that every man has in the service of his domestics; acquired by the contract of hiring, and purchased by giving them wages.

Blackstone, William, *Commentaries on the Laws of England, Book the First* 417 (2009). But this provision does not support All Star's argument. The modern duty of loyalty claim under which All Star sues does not encompass the right enumerated above for two reasons.

First, this provision of Blackstone's *Commentaries* is not relevant to facts of the present case. The right of a master to sue a fellow master who had poached the first master's servant was based in contract, and the fellow master's interference with that contract. But here, All Star *did not* sue HALO *for poaching Ford*. In other words, All Star *did not* sue HALO for interfering with the labor contract between Ford and All Star. Neither party suggests harm resulted from the mere fact that Ford left All Star's employ. All Star sued Ford and HALO *because Ford was disloyal* while he was still in All Star's employ and because HALO encouraged, enabled, and profited from that disloyalty.

Second, an employee's duty to faithfully serve a master was originally understood as *contractual* in nature, while the modern duty of loyalty claim for which All Star demands unlimited punitive damages is framed within the concept of a *tort*.

Neither does this passage support All Star's tortious interference claim, as that claim was predicated not on HALO's interference with *Ford's employment* and the corresponding labor contract but rather on HALO's interference with *All Star's poached clients* and the contractual relationship between All Star and those clients.

10

action before 1820.[12]  Regardless, All Star attempts to leverage its claim for civil conspiracy to breach Ford's duty of loyalty as a tort to avoid the punitive damage cap, despite the fact that, at common law, the duty of loyalty was contractual in nature.  All Star offers no authority suggesting that, prior to 1820, an employee's breach of the implied promise to perform work with integrity would have enabled the employer to sue the

---

[12] Punitive damages were first recognized in 1763 in England.  *See Huckle v. Money*, 2 Wils. 205 (K.B. 1763) (permitting "exemplary damages" for a tort action filed after the authorization of a generalized, "nameless warrant" used against the plaintiffs); *see also Wilkes v. Wood*, Lofft 1, 98 Eng. Rep. 489 (C.P.1763), (validating exemplary, or punitive damages as compensation, punishment, and deterrence on an action for trespass); *see also* David G. Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich. L. Rev. 1257, 1262-63 (1976).  Punitive damages were recognized in America shortly thereafter.  *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 15 (1991) ("Among the first reported American cases [allowing punitive damages] are *Genay v. Norris*, (1 Bay 6 S.C. 1784), and *Coryell v. Colbaugh*, 1 N.J.L. 77 (1791)."); *The Amiable Nancy*, 16 U.S. 546, 553 (1818) ("Actual wrongdoers in a marine trespass are responsible for exemplary damages …").  All Star advances no authority suggesting a Missouri court—or any court for that matter—adjudicating an action for assumpsit or any other action to enforce a contract sanctioned the use of the then-new remedy of punitive damages outside a claim for trespass or other common law tort.  What relevant authority this Court did locate suggests awarding punitive damages as a remedy for a contractual breach has long been disfavored.  In *Trammell v. Vaughan*, 59 S.W. 79, 82 (1900), after rejecting a claim of punitive damages on a claim for the breach of a contract to marry, this Court observed:

> The statements of the defendant to many persons after he returned from Hartsburg to the effect that he never had intended marrying the plaintiff, and had only taken the matter as far as he had to show Alfred Longley, Bill Gibbs, and Mr. Reynolds that he could marry her if he wanted to, were unmanly, cruel, and depraved, and were properly admitted in evidence to aggravate plaintiff's damages. **But they do not constitute a separate cause of action, nor can exemplary or punitive damages, as such, be recovered for a breach of a contract of marriage. The law punishes the defendant for the breach of his contract by making him compensate the plaintiff,** whether his intentions when he entered into the contract were sincere or sinister.

(Emphasis added).  Of course, punitive damages are not presently recoverable in contract actions under Missouri law.  *Peterson v. Cont'l Boiler Works, Inc.*, 783 S.W.2d 896, 902 (Mo. banc 1990).  But *Trammell* advises Missouri law never allowed such damages for breaches of contractual obligations, even when bad faith motivated the breach.

11

breaching employee and a third party outside the realm of contract law and seek punitive damages.

This Court addressed a similar situation in *Dodson*, 491 S.W.3d 542. In *Dodson*, this Court affirmed the application of a statutory punitive damages cap for a wrongful death action in part because it found wrongful death, a statutorily created cause of action enabling a claimant to recover damages resulting from another's death, was not "analogous to" a common law action for loss of services. *Id.* at 557. This Court explained the common law action for loss of services "rests on the theory that the relationship between [claimant and decedent] is akin to the contractual relationship of master and servant." *Id.* (internal quotation omitted). Therefore, the recovery for this common law action "flowed from the impairment of … property rights under [a] quasi-contractual relationship" which "sounds in contract, [and] is not analogous to a modem [sic] wrongful death claim, which sounds in tort. They may both be civil actions for monetary damages, but they arise from completely different principles of law." *Id.* *Dodson* persuasively compels the same conclusion here. While All Star attempts to frame its cause of action as a common law trespass or fraud claim warranting unlimited punitive damages, the breach of the duty of loyalty claim was nothing more than a breach of contract claim under common law for which punitive damages were not available in 1820, even if its current iteration sounds in tort. All Star has, therefore, not demonstrated civil conspiracy to breach the duty of loyalty was a claim entitling it to punitive damages at common law in 1820, and the circuit court did not err in applying the cap in section 510.265 to the punitive damages arising from the modern claim.

12

c. Tortious Interference with Business Expectancy

Turning to the tortious interference with a business expectancy claim, All Star's attempts to evade the punitive damage cap in section 510.265 meet a similar fate. Tortious interference with a business contract was not a claim available to Missouri litigants before 1820. *See Glencoe Sand & Gravel Co. v. Hudson Bros. Comm'n Co.*, 40 S.W. 93, 94 (1897), *overruled by Downey v. United Weatherproofing*, 253 S.W.2d 976 (1953)). In *Glencoe*, this Court refused to permit a claim of contractual interference after the defendant induced a railway company to breach its contract with the plaintiff to transport the plaintiff's gravel and sand. *Id.* This Court stated, "[m]erely to induce or procure a free contracting party to break his covenant, whether done maliciously or not … is not actionable …. An action cannot, in general, be maintained for inducing a third person to break his contract with the plaintiff." *Id.* at 95.

All Star attempts to avoid this Court's holding in *Glencoe* by generally alleging HALO's actions were fraudulent and deceitful and, therefore, subject to an exception *Glencoe* carved out for third-party breaches resulting from "the fraud, deceit, or coercion of defendant." *Id.* at 94. All Star's tortious interference claim, however, does not rely on or require a finding that HALO or Ford induced All Star's clients to breach its relationship with All Star based on fraud, deceit, or coercion. The jury instruction for All Star's tortious interference claim did not ask or direct the jury to determine if HALO or Ford acted with fraud, deceit, or coercion in interfering with All Star's business expectancy. In fact, the instruction merely required the jury to find HALO and Ford "interfered" with a business expectancy "intentionally and without justification or excuse[.]" While All Star may have

13

presented evidence of fraud, deceit, or coercion, these facts were unnecessary to establish All Star's tortious interference claim. All Star's claim, therefore, does not fall within the exception *Glencoe* enumerated, and, as *Glencoe* demonstrates, Missouri did not otherwise recognize a cause of action for tortious interference with a business expectancy in 1820.[13]

Attempting to evade the definitive guidance *Glencoe* provides, All Star insists the common law right to conduct one's business without interference has been recognized *at least* since the seventeenth century without the need to independently allege fraud, deceit or coercion, citing *Keeble v. Hickeringill*, 103 Eng. Rep. 1127 (1707). In *Keeble*, the court permitted suit against a man who shot at ducks from the plaintiff's pond for the purpose of scaring the ducks away and causing the plaintiff to lose profits. *Id.* But *Keeble* is easily distinguishable. That case arose from the fact that the defendant interrupted the plaintiff's right to enjoy and build a livelihood upon the plaintiff's *real property*. *Id.* at 1128 ("[E]very man that hath a property may employ it for his pleasure and profit, as for alluring and procuring decoy ducks to come to his pond."). As Justice Holt stated, "in short, that which is the true reason is that this action is *not brought to recover damage for the loss of the fowl, but for the disturbance*." *Id.* at 1129 (emphasis added). As was later clarified, *Keeble* was *not* an economic torts case but rather a nuisance case grounded in principles of property law. *See Allen v. Flood*, A. C. 1-181 (1898) (*Keeble* "was decided on the ground that the

---

[13] While a tortious interference claim may have been recognized in some form under the common law of other states, in *Glencoe* this Court explained that a cause of action akin to the claim brought against HALO had never before been recognized in Missouri and refused to adopt the claim. It was not until 1953 that this Court reversed course, first recognizing this cause of action. *See Downey*, 253 S.W.2d 976.

14

act of the defendant was, a wilful [sic] disturbance of the enjoyment by the plaintiff of his own land for a lawful and profitable purpose, and what is called in law a nuisance."); *see also* Simon Douglas & Ben McFarlane, *Philosophical Foundations of Property Law* 230 (2013).

All Star is correct that *Keeble* generally states "damage to a man's employment" is actionable when "a violent or malicious act is done to a man's occupation, profession, or way of getting a livelihood[.]" 103 Eng. Rep. at 1128. In support of this proposition, the court provided several hypothetical situations in which a business owner could sue another who interrupted the owner's business by violence or threats of violence.[14] *Id.* All Star's tortious interference claim, however, is very different from an action to recover damages for harm suffered to one's business as a result of violence or the threat of violence. To prevail in its tortious interference with a business expectancy claim, All Star was not required to establish or prove HALO and Ford acted violently or maliciously. As noted, the jury instruction for All Star's tortious interference claim merely required the jury to find HALO and Ford "interfered" with a business expectancy "intentionally and without

---

[14] *Keeble* explains:

> [S]uppose Mr. Hickeringill should lie in the way with his guns, and fright the boys from going to school, and their parents would not let them go … [the] schoolmaster might have an action for the loss of his scholars. A man hath a market, to which he hath toll for his horses sold: a man is bringing his horse to market to sell: a stranger hinders and obstructs him from going thither to the market: an action lies, because it imports damage. Action upon the case lies against one that shall by threats fright away his tenants at will. Trespass was brought for beating his servant, whereby he was hindered from taking his toll; the obstruction is a damage, though not the loss of his service.

103 Eng. Rep. at 1128.

15

justification or excuse[.]" For this reason, the modern tortious interference claim is much broader and can be distinguished from its predecessor, which limited suit only to situations in which the claimant demonstrated the business interference resulted from violence, fraud, or defamation. As the Restatement (Second) of Torts observed:

> Historically the liability for tortious interference with advantageous economic relations developed first in cases of intentional prevention of prospective dealings, by violence, fraud or defamation—conduct that was essentially tortious in its nature, either to the third party or to the injured party
>
> **In 1853, the decision in Lumley v. Gye** … **began the development of inducement of breach of contract as a separate tort .… Subsequent cases extended the rule of Lumley v. Gye to contracts other than contracts of service and to interference with advantageous business relations even when they were not cemented by a contract.**

Restatement (Second) of Torts § 766 cmt. c (1979) (emphasis added) (citation omitted). It was not until the nineteenth century when *Lumley v. Gye* was decided that a claim for tortious interference was cognizable on the mere allegation that the interference was intentional and without justification. This Court in *Glencoe*, however, expressly refused to follow the *Lumley* majority view and instead adopted the reasoning from the *Lumley* dissent that such an action was not recognized and was not cognizable under Missouri common law. 40 S.W. at 94. While English courts prior to 1820 may have adjudicated causes of action against business and contract disruptors *who were violent or threatened violence*, All Star has not advanced any case from Missouri in which a court entertained a cause of action against a disruptor who merely acted "intentionally and without justification or excuse" until after *Downey* was decided.

16

All Star also broadly alleges tortious interference, like the duty of loyalty, is a claim a Missouri court could have adjudicated under common law trespass. Even assuming *Glencoe* is not controlling, All Star's trespass argument misfires. While All Star may be correct that trespass actions generally encompassed harm to a person's property, the Blackstone's *Commentaries* - the authority All Star asserts supports this argument - indicate the trespass actions a litigant could assert for damages to property contemplated damage only to *tangible* property in the litigant's *personal possession*. Personal property:

> consists in goods, money, and all other moveable chattels, and things thereunto incident ….
> [I]njuries that may be offered to the rights of *personal* property … first the rights of personal property in *possession*, and those that are in *action* only.
> [ ] The rights of personal property in *possession* are liable to two species of injuries: the amotion or deprivation of that possession; and the abuse or damages of the chattels while the possession continues in the legal owner. The former, or deprivation of possession, is also divisible into two branches; the unjust and unlawful *taking* them away; and the unjust *detaining* them, though the original taking might be lawful.

Blackstone, *Commentaries, Book the Third* 1140 (emphasis in original) (footnote omitted). Aside from damages, litigants could seek the remedies of replevin, detinue, trover, and conversion. *Id.* at 1139-47. The tortious interference with a business expectancy and the lost profits alleged here arose from harm to *the contractual relationship* between All Star and its *customers*, not from any interference with All Star's chattels.[15] *Cmty. Title Co. v.*

---

[15] Admittedly, All Star did allege Ford stole tangible property from All Star, such as physical files, but this fact is irrelevant to the tortious interference claim, which litigants can only succeed on if they demonstrate the existence of the following elements:

> (1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and, (5) damages resulting from defendant's conduct.

*Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. banc 1990). This kind of *harm to a business relationship* or contract is not analogous to a cause of action for damages due to harm or injury to tangible *property or goods*. Blackstone later discusses harm to "franchises," but such causes of action arose from an individual's right to use *real property* as the individual wished. Blackstone, *Commentaries, Book the Third* 1218-19 (discussing the rights of real property). This right, called "disturbance of franchises"

> happens when a man has the franchise of holding a court-leet, of keeping a fair or market, of free-warren, of taking toll, of seizing waifs or estrays, or (in short) any other species of franchise whatsoever, and he is disturbed or incommoded in the lawful exercise thereof. As if another, by distress, menaces, or persuasions, prevails upon the suitors not to appear at my court; or obstructs the passage to my fair or market; or hunts in my free-warren; or refuses to pay me the accustomed toll; or hinders me from seizing the waif or estray, whereby it escapes or is carried out of my liberty; in every case of this kind…**there is an injury done to the legal owner**; **his property is damnified**; and the profits arising from such his franchise are diminished.

*Id.* (emphasis added). Because All Star does not allege HALO and Ford disturbed or interfered with the use of its real property, it cannot establish its tortious interference claim is analogous to—or has any relevance to—a claim of disturbance of franchise or trespass under common law in 1820. All Star does not proffer any other authority or make more specific arguments as to why these claims should be considered "analogous" to a modern tortious interference claim, and it cannot show the circuit court erred in applying the statutory damages cap in section 510.265 to that claim.

For these reasons, this Court finds All Star's common law causes of action against HALO and Ford either did not exist prior to 1820 or are not analogous to claims existing

---

*Cmty. Title Co.*, 796 S.W.2d at 372.

before 1820 for which juries could have awarded punitive damages. *See Dodson*, 491 S.W.3d at 555. Accordingly, this Court affirms the circuit court's application of the statutory damages cap to All Star's award of punitive damages.

## II. HALO's Claims

In its cross-appeal, HALO alleges a variety of errors. This Court considers only one of the several arguments HALO asserts.

### a. HALO's Briefing Deficiencies

In three points relied on, HALO raises seven distinct arguments. Each of HALO's points relied on and corresponding arguments violate the straightforward and mandatory requirements in Rule 84.04 governing appellate briefing. *Fowler v. Mo. Sheriffs' Ret. Sys.*, 623 S.W.3d 578, 582-83 (Mo. banc 2021). Specifically, all three of HALO's points relied on are multifarious, in that they contain multiple, divisible claims. *Id.* "Multifarious points relied on are noncompliant with Rule 84.04(d) and preserve nothing for review." *Macke v. Patton*, 591 S.W.3d 865, 869 (Mo. banc 2019); *see also* Rule 84.13 (instructing "allegations of error not briefed or not properly briefed shall not be considered in any civil appeal"). While this Court possesses the discretion to review non-compliant briefing, it must "cautiously exercise this discretion" else it "send[s] an implicit message that substandard briefing is acceptable." *Scott v. King*, 510 S.W.3d 887, 892 (Mo. App. 2017).

HALO's briefing is rife with deficiencies, and these deficiencies are more than superficial.[16]

Though this Court has discretion to review noncompliant briefing, it will exercise this discretion to review only one of HALO's claims. The court of appeals noted HALO's inadequate briefing before that court and sharply rebuked HALO for the deficiencies. The court of appeals nonetheless exercised its discretion to review all of HALO's relevant claims to the extent the arguments could be deciphered. HALO then submitted to this Court an appellate brief that replicated many, if not all, of those same flagrant flaws. There

---

[16] Aside from being multifarious, HALO's first point relied on, for example, references a claim of instructional error for future damages that HALO does not later pursue or otherwise explain in the corresponding argument section:

> *Tortious Interference with Business Expectancy.* The trial court erred in denying HALO's motion for a directed verdict on the claim for tortious interference with business expectancy, **in submitting to the jury the question of future damages on that claim**, and in denying HALO's motions for judgment notwithstanding the verdict on the tortious-interference claim, because All Star failed to submit any legally sufficient evidence of damages, in that the only legally sufficient evidence of damages was the $25,541.88 in lost profits from a handful of one-time diverted orders, which All Star expressly conceded and the trial court held was not the basis for the jury's $500,000 award for tortious interference, leaving that award unsubstantiated by any competent evidence.

(Emphasis added.). HALO's second point relied on contains two separate claims of error and is also multifarious:

> *Unreliable Evidence of Lost-Profit Damages.* The trial court erred in permitting All Star to introduce Exhibit 235 as evidence of All Star's lost profits and refusing to strike Mrs. Vogt's testimony regarding Exhibit 235 and lost profits, because that evidence and testimony was not admissible evidence of lost profits, in that Exhibit 235 was a made-for-litigation document containing a lay witness's calculations prepared through an unreliable methodology, and Mrs. Vogt's testimony was not based on actual facts or data that supported a rational estimate of lost profits.

20

was nothing inadequate about the court of appeals' process of review, and this Court will not once again extend HALO the benefit of *ex gratia* review.

The court of appeals, however, did not reach the due process claim raised in HALO's third point relied on, contending the reduced punitive damage award violated due process. This point relied on also violates Rule 84.04 as it is clearly multifarious and contains multiple, divisible claims.[17] Nevertheless, because HALO has not had the benefit of appellate review of this due process claim, this Court will exercise its discretion to do so.

### b. Due Process and Punitive Damages

HALO alleges the punitive damages award is grossly excessive and violates due process. HALO argues even the reduced $2,627,709.40 award is unconstitutional. The Missouri and United States constitutions prohibit the state from denying any person "life, liberty or property without due process of law." Mo. Const. art. I, sec. 10; U.S. Const. amend XIV, sec. 1. The United States Supreme Court has held this guarantee protects tortfeasors from "grossly excessive or arbitrary punishments[.]" *State Farm Mut. Auto.*

---

[17] The point relied on contends both that punitive damages were not submissible and that the punitive damages award was excessive and in violation of due process:

> *Punitive Damages.* The trial court erred in denying HALO's motions for a directed verdict and judgment notwithstanding the verdict on punitive damages and in denying, in part, HALO's motion to reduce the $5.5 million punitive damages award, because All Star did not make a submissible case for punitive damages, and the punitive damages award is grossly and unconstitutionally excessive, in that punitive damages are an extraordinary and harsh remedy that should be applied only sparingly and in cases with the kind of outrageous conduct not present here, and are subject to due process constraints that were not satisfied here.

21

*Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). This is because "[e]lementary notions of fairness" require defendants have "fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).

When faced with a claim that a punitive damages award violates due process, a court must consider three guideposts: (1) the degree of the reprehensibility of the defendant's conduct; (2) the ratio between the harm the defendant inflicted—measured in actual damages—and the punitive damages award; and (3) a comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct. *Id.* at 575; *see also Lewellen*, 441 S.W.3d at 146.

The degree of the offensiveness of HALO's conduct is the most important of the three factors. *Gore*, 517 U.S. at 575. Relevant to this consideration is whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419. All Star made a compelling demonstration that HALO's actions in the instant case deserve the reduced punitive damages award. In coordination with Ford, HALO pillaged All Star's client information, including confidential information about All Star's customers. HALO conspired with Ford to obtain a report that contained information on desirable, poachable clients that Ford directed All Star employees to unwittingly prepare. Using Ford's position and the information he procured, HALO

22

processed orders from All Star customers. HALO took these actions knowing Ford was still employed with and obliged to be faithful to All Star. When All Star learned of HALO and Ford's actions and demanded HALO cease taking orders from All Star customers, HALO initially refused. While HALO insisted it would take orders only from those customers with whom Ford had a long prior relationship, it did not actually ensure Ford had such relationships. This Court has found "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct … can warrant a substantial penalty." *Lewellen*, 441 S.W.3d at 146; see also *Gore*, 517 U.S. at 576. The first guidepost weighs in favor of the punitive damages award's constitutional validity.

The second guidepost—the ratio of actual damages to punitive damages—likewise suggests the reduced punitive damages award was constitutional. The jury awarded All Star $525,541.88 in actual damages. Following the jury's determination that $5.5 million in punitive damages was warranted, the circuit court reduced that award to $2,627,709.40, or five times the actual damages award. "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution[.]" *State Farm*, 538 U.S. at 425. HALO's conduct justified the circuit court's single-digit-ratio award.[18]

---

[18] In *Lewellen*, the defendants, a car dealership and its owner, trapped Lillian Lewellen, an elderly, financially vulnerable widow, into a fraudulent scheme in which they sold her a vehicle as part of a special deal, promising they would contribute to her payments to keep her monthly payment at $49. 441 S.W.3d at 140. Lewellen repeatedly told the defendants she could not afford to pay more than $49 a month, and the defendants assured her that would be the extent of her obligation, stating they would cover the rest. *Id.* The defendants later stopped contributing payments; Lewellen became unable to make up the difference. *Id.* at 141. The bank that provided her with the loan repossessed Lewellen's vehicle. *Id.*

The third guidepost concerns "the civil penalties authorized or imposed in comparable cases." *Gore*, 517 U.S. at 575. "The fundamental question is whether [HALO] had reasonable notice that its [participation in a civil conspiracy to breach an employee's duty of loyalty] and tortious interference with contracts and prospective business advantage could result in such a large punitive award." *Cont'l Trend Res., Inc. v. OXY USA Inc.*, 101 F.3d 634, 641 (10th Cir. 1996). No Missouri statute imposes civil penalties for civil conspiracy to breach the duty of loyalty or tortious interference with a business expectancy. One Missouri court tasked with analyzing the constitutional validity of a punitive damages award based in part on a tortious interference claim declined to assess this guidepost, finding:

> Tortious interference with contract involves acts that are ethically and morally reprehensible and are, in a civil sense, legally wrongful, whereas fraud claims founded in misrepresentation type acts are akin to criminal conduct for which sanctions might be identified and compared. The factor of comparative penalties is inconsequential in an action for tortious interference with contract.

*Env't Energy Partners, Inc. v. Siemens Bldg. Techs., Inc.*, 178 S.W.3d 691, 708 (Mo. App. 2005). In *Environmental Energy Partners*, the jury issued two compensatory damages awards—one for the defendant's tortious interference and the other compensating the plaintiff for a contract that a third party breached because of the defendant's tortious interference—totaling $127,546.25. *Id.* at 708. The corresponding punitive damages

---

This Court found the resulting 22:1 punitive damages award satisfied due process. *Id.* at 147. While HALO's actions may not be as egregious as the defendants' actions in *Lewellen*, the ratio of punitive to actual damages here was much smaller. The reprehensibility of HALO's conduct was sufficient to support a 5:1 punitive damages award.

award totaled $500,000. *Id.* The court of appeals, disregarding the third guidepost, ultimately upheld the nearly 4:1 ratio. *Id.*

Whether this Court disregards the final guidepost for the reasons *Environmental Energy Partners* articulates or discerns whether HALO had reasonable notice under the third guidepost, the result is the same. The third guidepost does not suggest the award was unreasonable and unconstitutional. In *Environmental Energy Partners*, the court of appeals affirmed the constitutional validity of a punitive damages award against a subcontractor who breached his subcontract with a primary contractor and interfered with the primary contractor's contract with a hospital. *Id.* at 695. The subcontractor failed to timely perform his end of the subcontract and refused to communicate with the contractor and to submit reports used to justify the subcontractor's payment requests to the contractor. *Id.* at 707. The subcontractor's actions resulted in the hospital withholding payment from the contractor on the contract between the hospital and the contractor. *Id.* The subcontractor later attempted to secure payment for his unfinished work by filing and attempting to perfect a mechanic's lien against the hospital, falsely representing his work on the hospital's property was complete. *Id.* The subcontractor ultimately reached an agreement with the hospital whereby the hospital paid the subcontractor money owed to the contractor; the hospital also agreed not to inform the contractor of the agreement. *Id.* at 708.

While the facts vary from the present case, *Environmental Energy Partners* provided a general warning that a defendant's intentional, wrongful actions resulting in tortious interference with a contract alone could reap *at least* a punitive damages award

25

near a 4:1 ratio.  This warning was sufficient to give HALO adequate notice that its conduct constituting tortious interference and civil conspiracy to breach the duty of loyalty could result in substantial punitive damages award.  Because none of the three guideposts suggest the reduced punitive damages award was arbitrary or excessive, or that HALO was deprived of fair notice of the potential consequences of its conduct, the 5:1 punitive damages award did not violate due process.  This point is denied.

## Conclusion

Because the circuit court did not err in applying the punitive damages cap in section 510.265 to reduce All Star's award of punitive damages and the reduced award is well within the constitutional parameters of due process, the circuit court's judgment is affirmed.

_____
W. Brent Powell, Judge

Wilson, C.J., Russell, Breckenridge, Fischer
and Ransom, JJ, concur; Draper, J., dissents

26